622 A.2d 979

**In re B.B.**

**Appeal of M.K.**

Superior Court of Pennsylvania.

Submitted Jan. 7, 1993.

Filed April 2, 1993.

**3.** In fact, as we noted above, Veneri has applied twice for federal *habeas* relief and both petitions were dismissed.

400

Jay Stillman, Asst. Public Defender, Williamsport, for appellant.

Ralph W. Thorne, Williamsport, for appellee.

Charles F. Greevy, III, Williamsport, for participating party.

Before WIEAND, OLSZEWSKI and HESTER, JJ.

HESTER, Judge:

This is an appeal from an order declaring B.B. an abused child and her mother, M.K., appellant, the perpetrator of the abuse by omission. M.K.'s paramour, Jason Jean, was named as the likely perpetrator of the abuse. B.B. was one and one-half years old when the abuse occurred. We affirm.

On November 19, 1991, Jason Jean took B.B., born February 13, 1990, to her baby-sitter, Christie Probst, about 9:00 a.m. Mrs. Probst changed B.B.'s diaper one hour later and discovered severe bruising across the child's buttocks. Unable to reach B.B.'s father, J.B., Probst called the paternal grandparents who then called Lycoming County Children and Youth Services (CYS). Mrs. Probst also called CYS.

Later that afternoon, Linda Bloom, a CYS caseworker, went to the Probst home to view the child's injuries, and took pictures of the bruised area. Ms. Bloom telephoned M.K. at work, and she immediately came to the Probst home. B.B. thereafter was examined in the emergency room of a local hospital.[1] The examining physician dated the infliction of the bruises to be between three to seven days prior. Ms. Bloom then ascertained the identities of all persons in whose care B.B. had been during that time and eliminated them as possible caretakers for B.B. As the natural father was away on a hunting trip, Bloom suggested the paternal grandparents act as custodians for B.B. and M.K. agreed. A few days later, B.B. was placed in the care and custody of her father, J.B.

B.B.'s parents never married but had resided together in J.B.'s house until their separation on October 1, 1991. From that date until November 19, 1991, B.B. primarily resided with her mother and mother's paramour, Jason Jean. There was no formal custody agreement or order; the parties alternated physical custody among J.B., the paternal grandparents, the maternal grandmother, and occasionally M.K.'s sisters. M.K. was employed full time, and B.B. went to the home of Christie

---

1. Due to the nature of the injuries and their location, there also was some concern initially that B.B. had been sexually abused. An examination by an obstetrician/gynecologist on November 20, 1991, determined that there had not been sexual abuse.

Probst Monday through Thursday, 9:00 a.m. until 5:00 p.m. On Fridays, she was in the care of another baby-sitter, Althea Alsbaugh.

The following procedural history is relevant. CYS filed a petition to declare B.B. a dependent child on January 9, 1992, under both the Juvenile Act, 42 Pa.C.S. § 6302, and the Child Protective Service Law, 23 Pa.C.S. § 6303. Hearings were held on January 29, February 7, and February 14, 1992. All parties were represented by counsel, including a court-appointed guardian ad litem for B.B. In addition to addressing the dependency action, the hearings addressed mother's petition for habeas corpus, filed December 13, 1991, by which she sought return of B.B. to her custody, and father's petition for custody filed December 23, 1991.

Appellant first argues that the evidence was insufficient to establish her as a perpetrator by omission. In support, she contends that the testimony of Dr. Nesbitt, the family physician, established that the bruises on B.B.'s buttocks "could indeed have come from an accident." Appellant's brief at 9. Moreover, she asserts that Nesbitt's testimony establishes that the injuries B.B. sustained obviously resulted from an isolated incident. Appellant argues that the evidence did not establish that she knew of the risk of harm to B.B. and failed to prevent it. We disagree.

First, Dr. Nesbitt's testimony did not establish that B.B.'s injuries could have resulted from an accident. Dr. Nesbitt had not examined B.B. In fact, Dr. Nesbitt had not seen B.B. for a nine-month period, from April, 1991, until January 13, 1992. Notes of Testimony ("N.T."), 1/29/92, at 70. If anything, this testimony establishes that appellant did not insure that B.B. received the medical attention prescribed for an infant between the age of one and two.

Moreover, regarding the bruises specifically, Dr. Nesbitt simply viewed the photographs taken on November 19, 1991. Counsel for appellant asked Dr. Nesbitt, "[C]an you determine by looking at the photographs whether it is accidental or an abusive type bruise?" Dr. Nesbitt replied, "I cannot by

looking at these photographs say with any degree of certainty whether they're accidental or inflicted." *Id.* at 69. This testimony does not establish, as appellant contends, that the bruises were consistent with an accident. It simply substantiates that Dr. Nesbitt could not tell, one way or the other, with any degree of certainty, **how** the bruising occurred.

■ Second, appellant's argument that even if Nesbitt's testimony did not establish that the bruising occurred accidentally, it merely was an isolated incident, is troubling. It appears that appellant is contending that one incident of child abuse is not enough; a pattern of abuse or multiple incidents must be shown. This child is to be afforded the protection of the law whether there was one incident of abuse or many.

Dr. Collins, the physician who examined B.B. on November 20, 1991, testified extensively and succinctly about the nature of the injuries. Dr. Collins stated:

> Of note, though, with the examination was a pronounced vertical bruising on the child's buttocks. These were bruises which I would have guessed was possibly five to seven days in age looking at the way the bruising was turning green at the time and the evidence of no broken skin at that time, but there was definitely multiple bruising on the child's buttocks. It would have been as if a ruler was used to repeatedly beat the child in that area. It was quite frankly something I have never ever seen in my life.

*Id.* at 54. Collins was asked about his statement that the bruising looked as if it had been made by a ruler. In reply, Dr. Collins stated:

> They're extremely parallel, uniform, straight, they're, if you really, I have product of 12 years of Catholic education back in the '50s and '60s, I know what the ruler looks like when it hits a buttocks. Quite frankly I have no doubt in my mind that it was very similar in appearance.

*Id.* at 55. Counsel also asked Dr. Collins if the bruises could have resulted if the child had been struck while wearing a diaper. Dr. Collins responded,

I dare say that the buttocks could be covered with a diaper and still suffer that kind of bruising, but the impact of the beating would have to be quite significant if a diaper could provide cushioning and still provide bruising like that, the kid would have to have been hit very, very hard.

*Id.* The doctor again was asked if the bruises could have resulted accidentally, and he stated, "No, it looks like a beating." *Id.* at 56.

Jason Jean, appellant's paramour, testified that he had struck B.B. with a paint stirrer one month before the incident. He testified that it was done in the presence of appellant, over the child's diaper, and with appellant's consent. Appellant confirmed Jean's testimony. N.T., 2/7/92, at 147. Linda Bloom testified that Mr. Jean told her he disciplined B.B. with a paint stirrer after losing the wooden ruler they used to discipline B.B. *Id.* at 179; N.T., 1/29/92, at 32, 33. The trial court found this testimony significant.

Appellant, appellant's paramour, and in fact, everyone who had B.B. in their care during the three to five days preceding November 19, 1991, denied inflicting the bruises or even noticing the bruises on B.B. Based upon the evidence presented, the trial court concluded:

This Court found that the child's grandmother had changed the child's diaper on the previous Saturday [November 19 had been a Tuesday] and had not observed the marks. Thereafter the child was in the mother's custody on Saturday evening when the mother bathed the child and applied cream to the diaper area on Saturday night, n.t. 157. She apparently changed the diaper several times on Sunday, n.t. 146, 157. The mother also admitted she "wiped her all up," on Sunday night. Again, the mother changed the diaper on the child at least once Monday evening, n.t. 163, after the child had spent all day with her paramour who is the likely perpetrator of the abuse. The testimony was clear that the child's diaper needed changed five or six times a day. (See, for example, n.t. 170, 154, 157). Therefore, the mother had to have seen the injuries. The Court concluded that the mother obviously knew of the abuse and knew the abuse had occurred at a time when her paramour

would have had custody of the child. The mother also was aware that the child had previously been physically punished by her paramour using a paint stirrer, a flat wooden ruler type tool, to spank the child, n.t. 147, 151, 152. The mother permitted the paramour to have custody of the child all day on Monday. Nevertheless, the mother denied any knowledge that her daughter had suffered any injuries and took no action to have the child examined or treated and did nothing to prevent her paramour from being in a position where he could exercise physical control of the child. Accordingly, the Court finds that the evidence was clear and convincing that the mother, [M.K.], had knowingly failed to protect the child from the injuries and failed to have the child treated for the injuries.

Trial court opinion, 6/23/92, at 8–9.

■ Our scope of review is dependency cases is well-settled:

> The standard of review which this Court employs in cases of dependency is broad. *In Re Custody of Neal,* 260 Pa.Super. 151, 393 A.2d 1057 (1978). However, the scope of our review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court. *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977). We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. *In Re Interest of Black,* 273 Pa.Super. 536, 417 A.2d 1178 (1980); *In Re Kunkle,* 265 Pa.Super. 605, 402 A.2d 1037 (1979). Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence. *Commonwealth ex rel. Morales v. Morales,* 222 Pa.Super. 373, 294 A.2d 782 (1972).

*In re: R.T.,* 405 Pa.Super. 156, 161, 592 A.2d 55, 57 (1991), quoting *In re: Frank W.D.,* 315 Pa.Super. 510, 517, 462 A.2d 708, 711 (1983). The findings of the trial court are supported by competent evidence and will not be disturbed.

■ Appellant's second issue is confusing and unclear. Appellant asserts that the evidence was insufficient to justify

removing B.B. from appellant's home. She contends the evidence is insufficient to support a finding of dependency, then acknowledges that B.B. was not found to be a dependent child. We discussed the sufficiency of the evidence *supra*, and will not repeat our discussion. We agree with the trial court that the evidence supported the removal of B.B. from appellant's home. Appellant asserts that if she had not agreed to place the child in the home of J.B., B.B. would have been placed in a foster home.

The trial court was correct in removing B.B. from appellant's home and placing her in the home of her father, J.B., without a finding of dependency. In *In re Justin S.*, 375 Pa.Super. 88, 543 A.2d 1192 (1988), this court held that a finding of dependency could not be made where the non-custodial parent "is ready, willing, and able to provide the child with proper parental care and control, especially when the lower court finds that the child was abused while under the custodial parent's care and control." *Id.*, 375 Pa.Super. at 103, 543 A.2d at 1199. The trial court was correct in finding that while B.B. was an abused child, she was not a dependent child since her father was ready, willing, and able to provide her with proper care. *See also In re: J.C.*, 412 Pa.Super. 369, 603 A.2d 627 (1992).

Order affirmed.