# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| S. M., | : | **CASE SEALED** |
| Petitioner | : | |
| | : | No. 1241 C.D. 2024 |
| v. | : | |
| | : | Argued: October 9, 2025 |
| Department of Human Services, | : | |
| Respondent | : | |

BEFORE:   HONORABLE ANNE E. COVEY, Judge
                    HONORABLE CHRISTINE FIZZANO CANNON, Judge
                    HONORABLE LORI A. DUMAS, Judge


## _OPINION NOT REPORTED_

**MEMORANDUM OPINION BY**
**JUDGE DUMAS**                                        **FILED:  January 22, 2026**


S.M. (Driver) has petitioned this Court to review the final order entered by the Department of Human Services (Department) on August 28, 2024, which affirmed the decision entered by the Bureau of Hearings and Appeals (Bureau) that listed him as an indicated abuser of J.S. (Child).  Driver contends that the Department failed to prove that he abused Child.  We affirm.

## I. BACKGROUND[1]

On February 17, 2022, Driver drove a van with four rows of passenger seats, transporting both verbal and non-verbal children (including Child) and an aide to the Children's Crisis Treatment Center (CCTC) school.[2]  Driver did not visually

---

[1] We state the facts in the light most favorable to the Department as the prevailing party. *See generally Leon E. Wintermyer, Inc. v. Workers' Comp. Appeal Bd. (Marlowe)*, 812 A.2d 478, 485 (Pa. 2002) (*Marlowe*).

[2] CCTC provides, *inter alia*, therapy for traumatized children.  *See generally In re W.U.* (Pa. Super., No. 934 EDA 2024, filed Sept. 27, 2024), 2024 WL 4318563, at *2.

sweep the van before starting his trip that day. The aide, seated in the row behind Driver, was responsible for assigning seats, assisting with dropping off the children, and signing in the children at pickup in the daily trip log.

The daily trip log lists over a dozen children, with boxes for pick-up time, drop-off time, trip mileage, and a parent's signature acknowledging pick-up. For example, the entry for Child reflected a pick-up time of 8:14 a.m., a drop-off time of 9:42 a.m., mileage, and an indecipherable signature, apparently that of Child's parent. The log also contains entries with a handwritten entry of "cancel" in lieu of a parent's signature. The record and the parties' briefs, however, do not address several apparent inconsistencies in the log.[3]

After Driver picked the children up and arrived at the school, he remained seated while the aide and the head teacher assisted with drop-off. After all the children purportedly exited the van, the aide handed a daily trip log to Driver (still seated), who entered the drop-off times for each child. Both Driver and the aide signed the log certifying that all children were dropped off. Ex. C-7.

The head teacher and the aide signed a separate "child's behavioral ride/transportation check sheet." The sheet required the aide to answer questions regarding each child's readiness for pick-up, behavior toward others, and related matters. The check sheet also required the person conducting a vehicle sweep to initial the form, but that line was left blank. Ex. A-1.[4] Driver did not sweep the van

---

[3] For example, the entry for the first child on the morning daily trip log reflects a 9:08 a.m. pick-up time, mileage of 143,218, and a "cancel" signature. Midway down the list, a different child's entry also shows a 9:08 a.m. pick-up time, the same mileage, and a parent's signature. The identical pick-up time and mileage suggest at least two possibilities: (1) two children were supposed to be picked up at the same time but only one child was present; or (2) only one child was supposed to be picked up but Driver inadvertently began completing the first entry. Further, the second-to-last listed child has a "cancel" signature but also includes completed entries for pick-up time, drop-off time, and mileage.

[4] Like the morning daily trip log, the check sheet was also incomplete for the first and

at this time. Notes of Testimony (N.T.), 4/6/23, at 35, 81-82.

Driver then left the school with the unsigned check sheet, dropped the aide off at her car, and drove another 45 minutes to the depot. He parked the van, gathered his belongings, locked the van, dropped off the keys, and went home. Driver did not sweep the van before leaving.

Later that day, utility workers heard a horn honking, discovered Child, and contacted the police. Child, who had fallen asleep in the last row, was uninjured but exhibited signs of distress. After Driver arrived home, the aide alerted Driver that they had left Child in the van. Driver contacted his manager, who verified that Child was found in the van. Driver expressed shock and offered to return to the depot, but his manager told him to stay at home.

The Department received a report and began investigating, which revealed that CCTC was treating Child. Following its investigation, the Department identified Driver and the aide as perpetrators of child abuse because of a repeated, prolonged, or egregious failure to supervise Child and filed indicated reports. Driver requested a hearing before a Bureau administrative law judge (ALJ), which was held in April 2023.

At the hearing, the Department investigator and Driver testified. The Department investigator testified that Driver "admitted that the van is supposed to be checked at drop off, but the head count and signatures from the teacher confirmed that all the children were off the van." N.T. at 35.

Driver corroborated the investigator's testimony and acknowledged his duty to ensure the accuracy of the daily trip log. *Id.* at 81 (agreeing with counsel's questions that he "had a duty" to independently verify the van was empty instead of

second-to-last listed child. Again, no one addressed the discrepancy, but the check sheet would appear to establish that the second-to-last listed child was not present on the van.

3

relying on "somebody else's information"), 84 (same). Driver stressed that he relied on the aide's and teacher's representations that all children had exited the van but admitted he never conducted any vehicle sweeps that day. *Id.* at 69, 81-84. Specifically, he failed to sweep the van three times: (1) when initially retrieving the van from the depot that morning; (2) when dropping the children off at school; and (3) when returning the van to the depot. *Id.* at 68-70, 81-82. Upon learning that Child had been left in the van, he testified: "Right then and there, I understood the circumstances of what happens next after that situation. So, I offered to come in to make sure that everything was okay." *Id.* at 69-70. Driver also testified that he relives this incident regularly and acknowledged that he should have swept the van. *Id.* at 70.[5]

The ALJ found their testimony detailed and credible and reasoned that Driver "knowingly disregarded an established procedure and job duty that [was] designed to prevent" the situation at bar by failing to sweep the vehicle at the depot. ALJ Op., 5/17/24, at 12-13. The ALJ concluded that the Department met its burden of proving via substantial evidence that Driver's repeated, prolonged, or egregious failure to supervise resulted in Child's serious physical neglect. *Id.*

The Bureau adopted the ALJ's opinion on July 11, 2024. Driver timely applied for reconsideration, which the Bureau timely granted. Bureau Order, 8/9/24. The Bureau denied relief on August 28, 2024, and Driver timely filed a petition for review with this Court.

---

[5] Driver further explained that he knew he was supposed to sweep the van but "didn't think [he] had a reason to. On a trip log[, he] was told all kids was [sic] off the van." *Id.* at 69. He "was real shocked" upon learning that he "left a child on the van." *Id.* Driver agreed he "had a duty" to personally verify that all children were off the van when dropping them off and at the depot. *Id.* at 81-82 (agreeing to counsel's and responding to the ALJ's questions). Driver's employer took several remedial measures after this incident. *Id.* at 37.

## II. ISSUES

Driver raises three issues, which we combine into two.[6]  First, Driver contends that the ALJ erred by holding that he committed child abuse because the "evidence did not establish that his actions were intentional, knowing, or reckless" as he "reasonably relied upon the information he had at the time."  Driver's Br. at 4.  Second, Driver maintains that the Department conducted a flawed investigation by failing to "interview key witnesses," "review key evidence," or "consider other individuals who contributed to the situation."[7]  *Id.*

## III. DISCUSSION[8]

### A. Knowingly Causing Serious Physical Neglect

#### *1. Arguments*

In support of his first issue, Driver argues the ALJ failed to analyze his

---

[6] The argument section of Driver's brief combined his first and third issues together.  *See* Driver's Br. at i-ii; *see generally* Pa.R.A.P. 2119(a) (stating the general rule for the argument section).

[7] The Department construes Driver's statement of issues as not challenging the ALJ's determination that Child's life or health was endangered.  Dep't's Br. at 10 n.2 ("The issues raised by [Driver] do not challenge [Bureau's] finding and determination that, in violation of the CPSL, the subject child's life, health and welfare was endangered when left alone and undetected for over 2 hours on the van and was subject to potential abduction and emotional [distress].") & 12 n.5 (same) (citing Driver's statement of issues).

[8] "Our review requires that the agency decision be affirmed absent a finding that constitutional rights were violated, an error of law was committed, that the procedure before the agency was contrary to statute, or that the findings of fact are not supported by substantial evidence." *J.F. v. Dep't of Hum. Servs.*, 245 A.3d 658, 667 (Pa. 2021) (citation modified).  We have defined "substantial evidence" "as relevant evidence upon which a reasonable mind could base a conclusion. . . .  The fact that a party may have produced witnesses who gave a different version of the events, or that the party might view the testimony differently than the [Department] is not grounds for reversal if substantial evidence supports the [Department's] findings." *Stage Road Poultry Catchers v. Dep't of Lab. & Indus., Off. of Unemployment Comp., Tax Servs.*, 34 A.3d 876, 885-86 (Pa. Cmwlth. 2011) (*Stage Road*) (citation modified).  "Similarly, even if evidence exists in the record that could support a contrary conclusion, it does not follow that the findings of fact are not supported by substantial evidence." *Id.* (citation omitted).  We must read all decisions against their facts.  *Maloney v. Valley Med. Facilities, Inc.*, 984 A.2d 478, 485-86 (Pa. 2009).

culpability thoroughly. *Id.* at 14-15, 17. Driver quotes the ALJ's only reference to his culpability: "by not performing the vehicle sweep when he dropped off the van at the depot, [Driver] knowingly disregarded an established procedure and job duty that is designed to prevent a situation like the one that occurred in this case." *Id.* at 15 (citation modified). Driver suggests that "acting knowingly with respect to a material element" of child abuse would require him to be "practically certain that his conduct (disregarding [his duty to sweep the van]) would cause the result (serious physical neglect)." *Id.*

His knowing disregard of his sweep duty, Driver reasons, did not "translate to the mental culpability required for child abuse." *Id.* at 15, 23. He maintains that he did not knowingly leave Child on the van or knowingly disregard a risk that he could leave Child on the van. *Id.* at 23-25; *see also* Driver's Reply Br. at 12-13 (discussing *Commonwealth v. Howard*, 257 A.3d 1217 (Pa. 2021) (plurality)). Driver emphasizes that he reasonably relied on the representations of the aide and teacher that all children were dropped off at school. Driver's Br. at 24. He contrasts his reliance with cases that, in his view, reflect a knowing perpetration of child abuse. *Id.* (citing, *inter alia*, *In re B.B.*, 622 A.2d 979 (Pa. Super. 1993), which we detail below).

Although "no one disputes [his] conduct was neither reckless nor intentional," Driver's Reply Br. at 4, Driver also maintains he did not act recklessly or intentionally. Driver's Br. at 17-22. In support, Driver discusses cases that, per Driver, ordered expungement because the record lacked evidence that the perpetrator acted intentionally or recklessly. *Id.* (discussing, *inter alia*, *R.L. v. Dep't of Hum. Servs.*, 236 A.3d 1183 (Pa. Cmwlth. 2020), which we address *infra*). Like those cases, Driver asserts, the instant record also lacks "evidence showing that [he]

6

perceived and then ignored . . . the risk that [Child] would remain unattended in the van by his oversight," *i.e.*, acted recklessly. *Id.* at 19. Driver similarly reasons the record lacks any evidence that he intentionally left Child on the van unattended. *Id.* at 21-22.[9] Driver does not expressly challenge the ALJ's finding that Child was endangered but consistently maintains he did not knowingly cause serious physical neglect. Driver's Br. at 15; *see* Driver's Reply Br. at 15 (concluding that "he did not knowingly leave the subject child unattended and thereby did not commit child abuse").

The Department counters that Driver knew of his duty to sweep the van and it was a duty he could not delegate to the aide. Dep't's Br. at 11, 15-16. The Department emphasizes that Driver knowingly decided not to sweep the van when dropping off the children at school, before signing the daily trip log, and when dropping off the van at the depot. *Id.* at 10-13. The Department stresses Driver nevertheless signed the daily trip log, thus vouching for its accuracy, *i.e.*, he accounted for all children. *Id.* at 11, 15, 18-20. Because the ALJ held Driver acted "knowingly," the Department rejects Driver's arguments that he did not act intentionally or recklessly. *Id.* at 15-17. The Department opines that "a school van driver who knowingly disregards a required safety procedure of sweeping his van for children, without exigent circumstances, can only be characterized as having committed an act of serious physical neglect . . . ." *Id.* at 18 (emphasis omitted). The Department states that Driver did not challenge the determination that Child's life was endangered. *Id.* at 10 n.2, 12 n.5.

---

[9] Driver also cites several unpublished cases, including *Phila. Cnty. Dep't of Hum. Servs. v. Dep't of Hum. Servs.* (Pa. Cmwlth., No. 659 C.D. 2019, filed Nov. 23, 2020), 2020 WL 6865566 (*R.V.*), and *In re A.B.* (Pa. Super., No. 407 EDA 2021, filed Sept. 20, 2021), 2021 WL 4261340. It is well-settled this Court is not bound by non-precedential or Superior Court decisions. *Marshall v. Se. Pa. Transp. Auth.*, 300 A.3d 537, 540 n.2 (Pa. Cmwlth. 2023). In any event, we address those cases below.

7

## *2. Knowingly Causing Serious Physical Neglect*

Generally, in response to a petition to expunge an indicated report of child abuse, the Department must prove via substantial evidence that the indicated report of child abuse is accurate. 23 Pa.C.S. §§ 6303, 6341(c.2)(5). "Substantial evidence" is evidence that "outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion" of child abuse. *Id.* § 6303. An indicated report may be based on the Department's investigation or a perpetrator's admissions of abuse. *Id.*; *E.M. v. Dep't of Hum. Servs.*, 191 A.3d 44, 61 (Pa. Cmwlth. 2018). In sum, to prove an indicated report of child abuse, the CPSL requires substantial "evidence that the person acted . . . knowingly . . . when [(a)] causing the injury or harm to the child or [(b)] creating a risk of injury or harm to the child." 23 Pa.C.S. § 6303(c).

"Child abuse" is defined as intentionally, knowingly, or recklessly causing, *inter alia*, "serious physical neglect of a child." *Id.* § 6303(b.1). "Serious physical neglect" is further defined as "a repeated, prolonged or egregious failure to supervise a child in a manner that is appropriate considering the child's developmental age and abilities" that "endangers a child's life or health" or "threatens a child's well-being." *Id.* § 6303.[10]

---

[10] For completeness, the statutory definitions follow. "The term 'child abuse' shall mean intentionally, knowingly or recklessly doing any of the following: . . . Causing serious physical neglect of a child." 23 Pa.C.S. § 6303(b.1)(7). The "serious physical neglect" definition is more detailed:

> Any of the following when committed by a perpetrator that endangers a child's life or health, threatens a child's well-being, causes bodily injury or impairs a child's health, development or functioning:
> (1) A repeated, prolonged or egregious failure to supervise a child in a manner that is appropriate considering the child's developmental age and abilities.
> (2) The failure to provide a child with adequate essentials of life, including food, shelter or medical care.

*Id.* § 6303.

The CPSL defines "knowingly" as follows: "A person acts knowingly with respect to a material element of an offense when" one of two conditions exist. 23 Pa.C.S. § 6303 (referencing 18 Pa.C.S. § 302); 18 Pa.C.S. § 302(b)(2). The first condition is "if the element [of an offense] involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist." 18 Pa.C.S. § 302(b)(2)(i). The second condition is "if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result." *Id.* § 302(b)(2)(ii).[11]

Our Supreme Court has examined 18 Pa.C.S. § 302(b)(2) in resolving whether a criminal defendant "knowingly" committed the offense of endangering the welfare of her child (EWOC).[12] *Howard*, 257 A.3d at 1222. In *Howard*, the defendant and her three-year-old child, while in a rideshare, were in an accident. Because the child was not wearing a seatbelt and there was no car seat, the defendant was convicted.

In resolving the parties' competing interpretations of the term "knowingly," the *Howard* lead opinion focused on the EWOC elements and

---

[11] Section 302(b)(2) follows:

> (2) A person acts knowingly with respect to a material element of an offense when:
> (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and
> (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S. § 302(b)(2)(i)-(ii). In turn, "conduct" is defined as an "action or omission and its accompanying state of mind, or where relevant, a series of acts and omissions." 18 Pa.C.S. § 103. An "omission" is a "failure to act." *Id.*

[12] At that time, EWOC was defined as a "parent, guardian, or other person supervising the welfare of a child under 18 years of age commits an offense if she knowingly endangers the welfare of the child by violating a duty of care, protection or support." *Howard*, 257 A.3d at 1220 n.3 (citation modified).

9

articulated a two-part framework. The Commonwealth must prove that the defendant was aware (1) of a duty that the child should have been in a car seat; and (2) that she placed the child in a dangerous situation. *Id.* at 1227 (stressing that the defendant need not be aware of a particular harm, such as a car accident). Nevertheless, the lead opinion focused almost exclusively on the second part by applying a "common sense of the community" standard. *Id.* at 1228-29. As for the first part, the lead opinion concisely noted the absence of a statutory duty on a non-driving parent.[13] *Id.* at 1229. In contrast, for the first part, Justice Dougherty reasoned that the Commonwealth failed to present sufficient evidence establishing the defendant's "actual awareness of a violation of a duty." *Id.* at 1232 (Dougherty, J., concurring) (agreeing that the trial court erred by imposing on the defendant a duty codified in the Vehicle Code, which, by its very terms, did not apply to the defendant). *Howard* vacated the conviction, reasoning the Commonwealth failed to present sufficient evidence as to the second part. *Id.* at 1230.

### 3. Discussion

Initially, the CPSL defines the offense of "child abuse" as knowingly "causing serious physical neglect." 23 Pa.C.S. § 6303(b.1). "Serious physical neglect" is further defined as a repeated, prolonged, or egregious failure to supervise a child that endangers the child's life or health or threatens the child's well-being. *Id.* § 6303. The CPSL seeks to prevent an actor from engaging in conduct that places a child in a dangerous or threatening situation, regardless of whether a particular harm actually transpired. *See id.*; *see also Howard*, 257 A.3d at 1227.

In other words, the Department was not required to prove that Driver

---

[13] By way of explanation, the Vehicle Code, "mandated that individuals who operate a vehicle and transport a child under the age of four securely fasten the child in a child passenger restraint system," but did not impose a similar duty on a non-driving parent. *Howard*, 257 A.3d at 1229.

10

knew his failure to sweep the van would, in particular, result in Child being left behind. *See Howard*, 257 A.3d at 1227. Indeed, Driver does not expressly challenge the ALJ's finding that his conduct endangered Child's life or health or threatened Child's well-being. *See* Dep't's Br. at 10 n.2, 12 n.5; *cf.* Driver's Br. at 15; Driver's Reply Br. at 15. Accordingly, we reject Driver's argument to the extent he suggests that he lacked the requisite *mens rea* because he was unaware Child was left behind on the van.

The record supports our rejection. Driver had three opportunities to sweep the van and discover Child: (1) when he dropped the children off at school; (2) before he signed and verified the accuracy of the daily trip log; and (3) when he returned the van to the depot. *See* N.T. at 68-70, 81-82. Driver missed all three. Driver admitted he knowingly failed to sweep the van three times and certified the daily trip log without independent verification. *See id.*

Because Driver admitted he had a duty, his own testimony forecloses his defense that he relied on the representations of others, assuming such a defense is cognizable under the CPSL.[14] Plainly, Driver cannot reasonably rely on the representations of the teacher and the aide that the van was empty because he admitted he had a duty to sweep the van three times. *See* N.T. at 68-70, 81-82. The daily trip log required two signatures (the aide and Driver) for a reason: two signatures ensures that each person verified the van was empty. *See* Ex. C-7. Driver chose not to sweep the van prior to signing the log, thus improperly certifying its accuracy. *See* N.T. at 84; ALJ Op. at 13. Driver's verification would have resolved any contradictory log entries. *See* Ex. C-7; N.T. at 84. If we accepted Driver's reliance defense, then any driver transporting verbal and non-verbal traumatized

---

[14] *See F.R. v. Dep't of Pub. Welfare*, 4 A.3d 779, 785 (Pa. Cmwlth. 2010) (suggesting that affirmative defenses under the Crimes Code do not apply to administrative proceedings).

11

children could escape culpability under the CPSL.

Turning to Driver's reliance on *Howard*, that case construed 18 Pa.C.S. § 302(b)(2) in the context of an EWOC criminal conviction. It is unclear whether our Supreme Court, in a plurality decision, intended to apply its focused elements-based framework to the instant civil expunction proceeding, which requires substantial evidence rather than proof beyond a reasonable doubt. *See Maloney*, 984 A.2d at 485-86. But even assuming *Howard* applies, we need not resolve whether the CPSL required Driver's knowledge that he endangered a child's life. Again, Driver does not explicitly challenge the ALJ's finding that a child was endangered. *See* Dep't's Br. at 10 n.2, 12 n.5.

In any event, the CPSL requires that a perpetrator "knowingly" cause serious physical neglect, *i.e.*, the repeated or egregious failure to supervise. *See* 23 Pa.C.S. § 6303(b.1). The *Howard* lead opinion took a similar approach by analyzing whether the mother knew that her conduct caused her child to be in a dangerous situation. *See Howard*, 257 A.3d at 1227-28. In doing so, the lead opinion, by focusing on the mother's conduct, did not examine whether the mother violated a specific statutory duty. *See id.* at 1228-29 (acknowledging the absence of a statutory duty and focusing on the result of the mother's conduct); *id.* at 1232-33 (Dougherty, J., concurring) (noting the record did not establish the mother's awareness that she violated any duty).

In contrast to *Howard*, Driver's employer imposed a duty on Driver to sweep the van and independently verify the accuracy of the daily trip log. Driver necessarily understood that his employer imposed this duty in order to prevent precisely the instant dangerous situation: endangering a traumatized child's life, health, or well-being by leaving him behind on the van. *See, e.g.*, N.T. at 69-70, 82-

12

84. In other words, Driver's knowing conduct, *i.e.*, the failures to sweep the van and to independently verify the daily trip log, necessarily establish that he knowingly endangered or otherwise threatened a child's well-being.

Respectfully, Driver cannot claim ignorance of the consequences from disregarding his duty to sweep the van because he immediately understood the gravity of his conduct upon learning Child was left behind. *See* N.T. at 69-70. His post-incident admission that he should have swept the van further corroborates his awareness that his conduct placed Child at risk. *See id.* at 70. Finally, the utility workers who heard Child honking the horn immediately recognized the gravity of the situation by contacting the police. *See* N.T. at 37. Even they recognized the dangers posed by Driver's conduct. For all these reasons, *Howard* does not control.

We also differ with Driver's interpretation of *B.B.* Driver's Br. at 23. Unlike the instant CPSL proceeding, *B.B.* arose in the context of a Juvenile Act proceeding to hold a child dependent and placed under court supervision.[15] *B.B.*, 622 A.2d at 981. In a dependency proceeding, the court focuses on the child and need not resolve culpability. *See In re Yeager*, 455 A.2d 717, 719 (Pa. Super. 1983) (stating that "neither the Juvenile Act nor Pennsylvania case law compels a showing of parental fault prior to an adjudication of dependency" (citation modified)).

We also distinguish *R.L.*, which Driver urges us to follow. Initially, *R.L.* addressed whether the petitioner, an overnight children's caretaker, recklessly created "a reasonable likelihood of bodily injury" to the child by falling asleep. *R.L.*, 236 A.3d at 1186-87. In contrast to *R.L.*'s reckless likelihood of bodily injury, the

---

[15] The Juvenile Act identifies a dependent child as falling within one or more of ten defined categories, *e.g.*, "evidence of conduct by the parent . . . that places the" child's health at risk. 42 Pa.C.S. § 6302 (defining "dependent child" as "a child who: (1) is without proper parental care . . . , or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent . . . that places the health, safety or welfare of the child at risk").

instant case involves a knowing repeated or egregious failure to supervise and not reckless or intentional conduct. *Cf. id.* at 1187 (defining "reckless"). Sufficient evidence exists that Driver knowingly engaged in conduct that resulted in serious physical neglect.[16]

### B. Inadequate Investigation

In support of his second issue, Driver assails the Department's investigation as insufficient and "unjustly lacking," emphasizing that the Department only presented one witness. Driver's Br. at 9, 25. He criticizes the Department's failure to interview any other witnesses, "despite the school's potential responsibility." *Id.* at 26. In Driver's view, a more thorough investigation would have established that Driver could not have "consciously disregarded or had reason to know of the risk" to Child. *Id.* at 25.

The Department counters that it presented sufficient evidence of child abuse. Dep't's Br. at 20. The Department quotes the Bureau's findings of fact, which the Department construes as supporting the indicated finding. *Id.* at 21-22. The Department asserts that Driver's statement to the investigator and his testimony provided the requisite evidence. *Id.* at 22-23. In the Department's view, Driver should have supported his argument with "examples of what possible relevant evidence" the school's employees might have provided as a defense. *Id.*

Initially, other than citing to the CPSL for the proposition that the

---

[16] As noted above, we are not bound by unreported or Superior Court decisions. In any event, in *R.V.*, we affirmed a determination that the agency did not present sufficient evidence that the father knowingly failed to procure proper medical treatment for the child. *R.V.*, 2020 WL 6865566, at *3. We affirmed because there was no testimony about the father's culpability and the father did not testify. *Id.* In contrast to *R.V.*, Driver testified. *A.B.* is also inapt as that case resolved the father's challenge to the "court's finding of his reckless failure to protect" the child. *A.B.*, 2021 WL 4261340, at *4. To be clear, we reject Driver's reliance on caselaw addressing reckless or intentional conduct.

Department must present substantial evidence to support an indicated report of child abuse, Driver cited no legal authorities addressing an inadequate investigation. He thus waived the issue. *See* Pa.R.A.P. 2119 (requiring discussion and citation of pertinent authorities).

In any event, on the merits, Driver essentially challenges the sufficiency of the Department's substantial evidence. As set forth herein, Driver conceded he failed to sweep the vehicle on three occasions that day, which resulted in Child being left alone in a locked van for two hours, *i.e.*, serious physical neglect. *See, e.g.*, N.T. at 68-70, 81-82. Even accepting Driver's argument that additional witnesses should have been interviewed, Driver admitted the facts material to his culpability: he knew he was supposed to sweep the van and the consequences of his failure. In other words, in light of Driver's admissions, no testimony could have excused Driver's conduct. Viewing Driver's conduct and the evidence in the light most favorable to the Department as the prevailing party, the Bureau did not err. *See Marlowe*, 812 A.2d at 485; *E.M.*, 191 A.3d at 61; *Stage Road*, 34 A.3d at 885-86.

## IV. CONCLUSION

The Department presented substantial evidence that Driver knowingly failed to sweep the van and knew that failure to sweep the van would create a dangerous situation. Driver has not demonstrated that the Department's investigation was inadequate. For these reasons, after viewing the entire record and all reasonable inferences therefrom in the Department's favor, we affirm the Bureau's adjudication.

**LORI A. DUMAS, Judge**

15

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

S. M.,                                          :      **CASE SEALED**
                    Petitioner                  :
                                                :      No. 1241 C.D. 2024
          v.                                    :
                                                :
Department of Human Services,                   :
                    Respondent                  :

## O R D E R

AND NOW, this 22nd day of January, 2026, we AFFIRM the order entered on August 28, 2024, by the Department of Human Services' Bureau of Hearings and Appeals.

_____
**LORI A. DUMAS, Judge**